```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF MISSISSIPPI
                         GREENVILLE DIVISION


   MAURICE MASON, SHARON WADE,
   LADAYTON WILLIAMS, OLLIE HARDMON,
   AND WILLIE JOE SAFFORD                         PLAINTIFFS


   V.                        CIVIL ACTION NO. 4:20-CV-164-DMB-JMV


   CITY OF CLARKSDALE; COAHOMA COUNTY,
   MISSISSIPPI; COAHOMA COUNTY SHERIFF'S
   OFFICE, MASTER SERGEANT MARCUS COHEN,
   INDIVIDUALLY AND IN HIS OFFICIAL
   CAPACITY, DEPUTY ERIC BILBRO,
   INDIVIDUALLY AND IN HIS OFFICIAL
   CAPACITY, AND JOHN AND JANE DOES 1-10         DEFENDANTS



                    VIDEO DEPOSITION OF EDDIE EARL

        Taken at the instance of the Plaintiffs on Tuesday,
     October 5, 2021, in the offices of Jacks|Griffith|Luciano,
        P.A., 150 North Sharpe Avenue, Cleveland, Mississippi,
                        beginning at 11:05 a.m.




                       (Appearances noted herein)






         REPORTED BY:   Courtney R. Taylor, CCR, TLC
                        Alpha Reporting A Veritext Company
                        236 Adams Avenue
                        Memphis, Tennessee 38103
```

```
 1   APPEARANCES:
 2
       JUAN T. WILLIAMS, ESQ.
 3     Perry Griffin, P.C.
       5699 Getwell Road, Building G, Suite 5
 4     Southaven, Mississippi 38672
 5        COUNSEL FOR PLAINTIFFS
 6
 7
       ARNOLD U. LUCIANO, ESQ.
 8     Jacks|Griffith|Luciano, P.A.
       150 North Sharpe Avenue
 9     Cleveland, Mississippi 38732
10        COUNSEL FOR DEFENDANT, COAHOMA COUNTY
11     MICHAEL CARR, ESQ.
       Carr Law Firm, PLLC
12     301 West Sunflower Road, Suite D
       Cleveland, Mississippi 38732
13
          COUNSEL FOR DEFENDANTS, MARCUS COHEN &
14           ERIC BILBRO
15
16
       ALSO PRESENT: JASON HOPKINS, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25
                                                Page 2
```

```
 1             INDEX
 2   Style and Appearances............................. 1-2
 3   Index............................. 3
 4   Examination by Mr. Williams....................... 4
 5     Exhibit 1................................ 69
 6   Certificate of Deponent............................ 70
 7   Certificate of Reporter............................ 71
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                Page 3
```

```
 1         THE VIDEOGRAPHER: Good morning. We're
 2   going on the record at 11:05 a.m. on
 3   October the 5th, 2021. Please note that the
 4   microphones are sensitive and may pick up
 5   whispering, private conversations, cellular
 6   interference. Please turn off all cell
 7   phones and place them away from the
 8   microphones as they can interfere with the
 9   deposition audio.
10         The audio and video recording will
11   continue to take place unless all parties
12   agree to go off the record. This is the
13   video recorded deposition of Eddie Earl,
14   taken by counsel for the plaintiff (sic) in
15   the matter of Maurice Mason and others versus
16   the City of Clarksdale and others, filed in
17   the United States District Court for the
18   Northern District of Mississippi, Greenville
19   Division. Case Number 4:20-CV-164-DMV-JMV.
20         This deposition is being held at 150
21   North Sharpe Avenue, Cleveland, Mississippi.
22   My name is Jason Hopkins and I'm the
23   videographer. The court reporter is Courtney
24   Taylor.
25         We are both from the firm Veritext
                                                Page 4
```

```
 1   Tennessee. I'm not related to any party in
 2   this action, nor am I financially interested
 3   in the outcome.
 4         Counsel and all present in the room will
 5   now state their appearances and affiliations
 6   for the record, and, if there are any
 7   objections to the proceedings, please state
 8   them at the time of your appearance,
 9   beginning with the noticing attorney. After
10   which, our court reporter may swear in the
11   witness and we may proceed.
12         MR. WILLIAMS: Juan Williams. I'm the
13   attorney for the plaintiffs.
14         MR. CARR: My name is Michael Carr. I'm
15   the individual attorney for Marcus Cohen and
16   Eric Bilbro.
17         MR. LUCIANO: My name is Arnold Luciano,
18   and I'm the attorney for most of the
19   defendants, Coahoma County.
20             EDDIE EARL,
21   having first been duly sworn, was examined and
22   testified as follows:
23   EXAMINATION BY MR. WILLIAMS:
24         Q. All right. Okay. Hello, Deputy Earl.
25         A. How are you doing, sir?
                                                Page 5
```

2 (Pages 2 - 5)

Alpha Reporting  
A Veritext Company  
800-556-8974  
www.veritext.com

**Page 6**

1  Q. As you read, my name is Juan Williams. I
2  know you've seen me before, of course.
3  A. Yes, sir.
4  Q. And is it your understanding that you
5  have -- I have deposed you before in the past?
6  A. Yes, sir.
7  Q. And it was in another matter, correct?
8  A. Yes, sir.
9  Q. It was in the matter of Myron Pollard
10 versus Coahoma County.
11     Do you remember that deposition?
12 A. Yes, sir.
13 Q. Do you remember me asking you questions
14 during that time?
15 A. Yes, sir.
16     MR. WILLIAMS: All right. This is a
17 copy of that deposition, and I would like to
18 enter it into -- as an exhibit to this
19 testimony.
20     MR. LUCIANO: Let me see it. 233 pages,
21 it looks like.
22     You want this one?
23     That way -- I'm sorry -- to the court
24 reporter.
25 Q. (By Mr. Williams) My main purpose for

**Page 7**

1  entering that is we don't have to go back over
2  introductory stuff, stuff regarding the past
3  discipline that we had already been over.
4     But I will be asking you some new
5  questions.
6     Do you understand?
7  A. Yes, sir.
8  Q. Okay. You understood that -- you
9  understand that you are under oath today, correct?
10 A. Yes, sir.
11 Q. And you understand it has the same effect
12 as if you are in a court of law?
13 A. Yes, sir.
14 Q. Besides that deposition that I took with
15 you earlier, have you taken -- have you given any
16 other depositions?
17 A. No, sir.
18 Q. Okay. And I always tell a person, if I
19 don't -- if I say a question and you don't
20 understand it, please correct me, stop me, tell me,
21 "Hey, don't" -- or whatever, wave your hands.
22 Because I want to be able -- if I ask you a
23 question, I want to be -- make sure that you
24 understand that question.
25     Okay. And if you answer, I want you to be

**Page 8**

1  able to say, "Hey, I understood the question that
2  was -- was asked, and I understood my answer."
3     Okay?
4  A. Yes, sir.
5  Q. All right. You're doing a good job. When
6  you answer all questions, make sure you say, "Yes,"
7  "no," say something verbal, because she can't take
8  down head nods and can't take down "uh-huh" and
9  "huh-uh."
10    Okay?
11 A. Yes, sir.
12 Q. Is there anything that would prevent you
13 from giving your full attention to me, to answering
14 these questions today?
15 A. No, sir.
16 Q. Are you under -- under the influence of any
17 alcohol or drugs that would prevent you from
18 taking -- answering these questions today?
19 A. No, sir.
20 Q. If you need a break -- we shouldn't be
21 long, but if you need a break, just let me know.
22 And I'll be happy to let you have one, but I would
23 just ask that you answer whatever question is before
24 you before you get that break.
25    Okay?

**Page 9**

1  A. Yes, sir.
2  Q. All right. Then we'll begin.
3     Have you had any changes in your address
4  since our last deposition?
5  A. No, sir.
6  Q. Have you had any changes in your marital
7  status since the last deposition?
8  A. No, sir.
9  Q. Have you had any -- any additional children
10 since my last deposition?
11 A. No, sir.
12 Q. Have you been arrested or charged with a
13 crime since our last deposition?
14 A. No, sir.
15 Q. Have you had any changes in your employment
16 since our last deposition?
17 A. Yes, sir.
18 Q. Okay. What is that change?
19 A. I work for Judge Derek Hopson as a private
20 investigator.
21 Q. And what is -- Judge Hopson, you said?
22 A. Derek Hopson.
23 Q. Okay. What kind of judge is he?
24 A. Municipal and cit- -- justice court judge.
25 Q. For what -- for what area?

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 10**

1     A. Coahoma County and the City of Clarksdale.
2     Q. Okay. So he's the justice court judge for
3 Coahoma County and the City of Clarksdale?
4     A. Yes, sir.
5     Q. And --
6     A. Well, he's the municipal court judge for
7 the City of Clarksdale and justice court judge for
8 the County.
9     Q. So you do work for both of them?
10     A. No, I pretty much -- when the detectives
11 come in and they want him to sign a search warrant,
12 I'll review over the search warrant to make sure
13 that it's up to par before letting the judge look
14 over it and sign his signature. If it's something
15 that needs changing, I will tell the detective, you
16 know, "You might need to correct that," you know,
17 before moving forward to allow the judge getting a
18 signature on it and different things that need
19 looking into as far as private investigation work.
20     Q. Okay. Do you actually go out and do any of
21 the private investigation yourself?
22     A. I do, whatever -- whatever assignment he
23 has for me to do.
24     Q. And what does that entail, when you're
25 going out and doing the investigation?

**Page 11**

1     A. Well, I pretty much do investigations
2 that -- for like his clients at his law firm --
3     Q. Oh, okay.
4     A. -- different things like that.
5     Q. So you're -- you're just working for the
6 judge as an individual, not for the actual County or
7 City?
8     A. No.
9     Q. No, you're not working for the County and
10 City, or, no, you're --
11     A. I'm -- I'm actually working for the judge
12 individually.
13     Q. Okay. That's -- that's what I was trying
14 to --
15     All right. So he just pays you directly
16 through his law firm or whatever for whatever work
17 you do for him?
18     A. Yes, sir.
19     Q. Okay. How long have you been in that
20 position?
21     A. Since I left the sheriff's department.
22     Q. When did you leave the sheriff's
23 department?
24     A. Last month on the 14th.
25     Q. Okay. And what prompted this change of

**Page 12**

1 position?
2     A. I just resigned.
3     Q. Okay. You resigned?
4     A. Yes, sir.
5     Q. Was -- did anyone ask you or prompt you to
6 resign?
7     A. No, sir.
8     Q. Did anyone meet with you regarding your
9 resignation?
10     A. No, sir.
11     Q. They just -- you just turned in your
12 resignation, and nobody said anything, and they just
13 said, "Fine"?
14     A. Yes, sir, pretty much, you know, to seek
15 something better.
16     Q. You said -- who did you -- who did you turn
17 your resignation in to?
18     A. The sheriff.
19     Q. Okay. And what did he say?
20     A. He didn't say nothing, pretty much, you
21 know.
22     Q. Okay. Now, how much were you making when
23 you left the police department -- when you left the
24 sheriff's department?
25     Sorry.

**Page 13**

1     A. About $19.50-something an hour.
2     Q. How much do you make working for the judge?
3     A. I make like $18-something an hour.
4     Q. So you took a pay cut?
5     A. Yes, sir.
6     Q. So -- and what prompted you to just leave
7 your job, take a pay cut to work -- from working for
8 the County to go work for the judge as an
9 individual?
10     A. Well, right now, my kids' mother, she's in
11 RN school.
12     Q. Okay.
13     A. And it'll be -- it'll -- it was beneficial
14 for my family --
15     Q. Uh-huh.
16     A. -- I would say, you know, as far as helping
17 her with the kids where she can commit -- fully
18 commit to her studies, because she's not -- she's
19 not working right now and attending school. And I'm
20 also employed with the City of Jonestown part-time,
21 also.
22     Q. All right. So you're working as a police
23 officer with Jonestown?
24     A. Uh-huh.
25     Q. And how far is Jonestown from Clarksdale?

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

```
1    A. Less than five minutes.
2    Q. Okay. And how often do you work over
3  there?
4    A. Pretty much when I -- probably like maybe
5  three, four days out of the week when I'm -- when
6  I'm not with the judge -- when I get off from the
7  judge.
8    Q. Okay. Now -- I'm sorry.
9       Now, you said that -- how -- how long is
10 this job supposed to last with the judge?
11   A. Pretty much, you know, as long as he, you
12 know -- he'll have me, but I pretty much, you know,
13 been working with him day in and day out.
14   Q. Okay. And what were -- what are your hours
15 when you're working with the judge?
16   A. 8:00 to 5:00.
17   Q. And then you may go work a few hours for --
18   A. Jonestown.
19   Q. -- after you get off of that?
20   A. Yes, sir.
21   Q. And so what time do you usually get off
22 from --
23   A. From the judge?
24   Q. -- from Jonestown?
25   A. I'll probably go maybe like around 6:00 and
                                              Page 14
```

```
1  work 6:00 to 12:00.
2    Q. Okay. So in terms of income, your actual
3  income, is your income more or less now than it was
4  when you were with the -- with the sheriff's
5  department?
6    A. I would -- it -- it's more now, you know,
7  because I took on the responsibility of that
8  part-time job.
9    Q. Okay. Did Coahoma County prevent you from
10 taking on a part-time job?
11   A. The sheriff wouldn't -- he wouldn't let
12 none of his investigators have a second job.
13   Q. Okay. Now --
14   A. Because I tried to work for Jonestown
15 before when I was employed with him, and he said no.
16   Q. Uh-huh.
17      Now, did the judge approach you about this
18 position or did you approach him about the new
19 position?
20   A. Well, he had been asking me about it, doing
21 it part-time for him, and --
22   Q. Uh-huh.
23   A. -- when he found out that I had resigned
24 from the sheriff's department, that's when he
25 offered me the full-time position.
                                              Page 15
```

```
1    Q. Okay. So you resigned from the sheriff's
2  department before you took the position with the --
3  the new position?
4    A. Well, the day I resigned from the sheriff's
5  department, the next day, I was with the judge,
6  because I had already been working with him
7  part-time in my spare time.
8    Q. Okay. So you were working -- so you were
9  already working with him part-time?
10   A. Yeah, just like going like -- nothing doing
11 like private investigation. Like he may have, you
12 know -- called me up and say, you know, "I need a
13 subpoena" or something served, something to that
14 effect.
15   Q. Okay. And so you -- you resigned your
16 position before you -- before you talked to him
17 about the new position, correct?
18   A. No. We had already discussed about the --
19 the position -- me taking that full-time position
20 before I actually resigned.
21   Q. Okay. And then after you resigned, he went
22 on ahead and --
23   A. Yeah, the next day I was with him.
24   Q. Okay. And how are your benefits as
25 compared to when you were working with Coahoma
                                              Page 16
```

```
1  County?
2    A. They're the same. I mean, I still, you
3  know, kept my insurance.
4    Q. So you still have insurance through the
5  County?
6    A. Uh-huh.
7    Q. How is that?
8    A. Like you had an option to where -- well,
9  you would just have to pay a little bit more, if
10 you --
11   Q. Oh.
12   A. -- keep it on your own versus, you know,
13 you get a certain percentage that you have to pay if
14 you're with the employer.
15   Q. Oh, so you're COBRA-ing your insurance,
16 basically?
17   A. Uh-huh.
18   Q. Okay. And is that a "yes"?
19   A. Yes, sir.
20   Q. Okay. Now, what were your hours when you
21 were working for Coahoma County?
22   A. Oh, they varied. Some days I might work
23 8:00 to 5:00; some days I might work 1:00 to 10:00;
24 then some days I might work from 5:00 to 1:00.
25   Q. And how did that affect -- how did that
                                              Page 17
```

5 (Pages 14 - 17)

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 18**

1 affect your ability to help your -- the mother of
2 your children and your children?
3   A. It was -- it was a hassle, and sometimes it
4 became too much, because my sleep patterns was
5 thrown off from time to time. And, sometimes, you
6 know, I had to make arrangements for my mother to
7 pick my kids up from school.
8      And it just -- like I said, just -- just
9 the changing in the scheduling, I just couldn't get
10 acclimated with it.
11  Q. Okay. And how -- how old are your
12 children?
13  A. I have one that's five, and I have one
14 that's three, and then I have one that's four. And
15 then I have a two-year-old.
16  Q. Okay. Now, since the change in your
17 position, what is your routine in terms of the
18 children?
19  A. Oh, I'm able to take them to the school and
20 pick them up, you know, every day now.
21  Q. Uh-huh. Yeah.
22      Now that you're -- the kids, what time do
23 they get out of school?
24  A. They normally get out around 2:45.
25  Q. So the -- so when you go to pick them up

**Page 19**

1 while you were -- so your judge will let you go and
2 pick them up from -- take time off and go pick them
3 up and -- when you do?
4  A. Yes, sir.
5  Q. And then you just drop them off and come
6 back?
7  A. Yes, sir, and I take them -- take them on
8 home -- well, I take them to my grandmother's house,
9 and then I go back to work. And then once I get
10 off, I'll pick them up from my grandmother's.
11  Q. Okay. And what are your -- what hours or
12 whatever do your mother -- does the mother of your
13 children -- what hours is she in school with it,
14 basically?
15  A. She goes to school at 8:00, and she
16 normally gets out probably around 3:00.
17  Q. Okay. And where does she go to school?
18  A. She attends -- she's in the RN program with
19 Coahoma Community College.
20  Q. Okay. And when's her expected graduation?
21  A. In May.
22  Q. Okay. And you said up until you just
23 resigned, no one threatened or asked you to resign
24 or quit or anything of that nature, correct?
25  A. No, sir.

**Page 20**

1  Q. And so how would you -- you would define --
2 how would you define your leaving the sheriff's
3 department?
4      Would it -- would you describe it as
5 amicable?
6      Would you describe it as amicable? Was it
7 something where they said, "You're" -- "you're" --
8 "You are rehired, you can come back anytime," or --
9  A. Yeah, I can -- I can come back if I wanted
10 to.
11  Q. And they -- and they told you that you're
12 free to come back?
13  A. Pretty much.
14  Q. So --
15  A. Pretty much from my supervisor. I mean, I
16 don't know about the sheriff. I don't deal directly
17 with him, but, from my supervisor, he -- the chief
18 deputy, said, you know, that if I wanted to come
19 back, I could.
20  Q. And what's that -- what's that chief
21 deputy's name?
22  A. Fernando Bee.
23  Q. And you say you -- you never spoke with the
24 sheriff regarding that, correct?
25  A. No, sir.

**Page 21**

1  Q. All right. How did -- what did you do to
2 prepare for this deposition today?
3  A. Nothing. The only thing I can tell you is
4 from what happened when I -- when I was working
5 there during the time of the events.
6  Q. Okay. So no one gave you any documents or
7 anything like that to review or anything?
8  A. No, sir.
9  Q. Okay. And -- now, prior to the date of the
10 shooting, did you have any interaction with Maurice
11 Mason?
12  A. No, sir.
13  Q. Had you had any contact with Sharon Wade?
14  A. No, sir.
15  Q. Had you had any contact with Willie Joe
16 Safford?
17  A. No, sir.
18  Q. Had you had any contact with Ollie Hardmon?
19  A. No, sir.
20  Q. Had you had any contact with Ladayton
21 Williams?
22  A. No, sir.
23  Q. Now, according to the report, you had a
24 confidential informant make a buy at that -- at
25 907 -- at -- at 907 Pecan Street?

Page 22:

1  A. I think that's the address. It's in the
2  900 block. I don't know exactly what -- what's --
3  the address is. It's been sometime now.
4  Q. Okay. We'll just -- we'll just say at --
5  at the home of Ladayton Williams.
6     Okay?
7  A. Yes, sir.
8  Q. That'd be fine?
9     So you had someone make a buy at the home
10 of Ladayton Williams?
11 A. Yes, sir.
12 Q. And what date -- do you remember what date
13 that was?
14 A. No, sir, I can't recall the date.
15 Q. Do you remember how -- how far was it
16 between the date of the buy and the date that --
17 that -- that you -- that you went and raided the
18 home?
19 A. I would say probably -- I would say
20 probably in the next day or maybe a couple of days
21 after.
22 Q. Okay. Do you typically have someone watch
23 the home during that time period, between when you
24 -- when you -- when the C- -- when the CI makes the
25 buy and when you actually go in and make -- and do

Page 23:

1  the raid?
2  A. No, sir. I -- I only watch the CI at the
3  time when he's doing the undercover operation, and
4  that's for his safety, you know, just if something
5  were to break bad, that I can be there to protect
6  him or her.
7  Q. Okay. Now, that CI, do -- do they -- are
8  they required to wear any audio or visual recording
9  devices?
10 A. Yes, sir.
11 Q. Was there -- was there one on this
12 particular date wearing any?
13 A. Yes, sir.
14 Q. Okay. Do you know who's in possession of
15 those recordings?
16 A. I turned the case in to the district
17 attorney's office, and they should -- they -- they
18 have a copy of everything.
19 Q. Okay. Now, this CI, how many -- how long
20 had you been dealing with this individual?
21 A. I would say probably over two years.
22 Q. And so this person had made multiple buys
23 for you?
24 A. Yes, sir.
25 Q. And had they testified -- they ever

Page 24:

1  testified in court for you before?
2  A. Yeah, they have.
3  Q. Have this person ever been found to be
4  making untrue statements in a trial or to you?
5  A. No, sir.
6  Q. And what is your procedure for making
7  someone a -- a CI?
8  A. Pretty much, our number one thing is to
9  prove them credible, and to prove -- how to prove
10 them credible is through wearing audio and video
11 surveillance footage and proving them credible and
12 building their credibility that way.
13 Q. Now, the -- the bills that the person used
14 to make the buy, are they marked?
15 A. Yes, sir, and photographed.
16 Q. Okay. And you -- do you mark and -- do you
17 do the same, mark and photograph whatever he buys
18 when -- on that particular day?
19 A. Yeah. Any time I give my informants
20 Coahoma County Sheriff's Office funds, I -- I always
21 take photographs of the funds and write the funds
22 down for the -- for the investigator report to be
23 articulated in court. And that's for every one of
24 my CIs, I do that for.
25 Q. Uh-huh.

Page 25:

1     Now, what are your methods for identifying
2  whoever the seller of -- -- of whoever you're going
3  to make the buy from?
4  A. Pretty much what I do is I get out and I
5  get in the streets. I gather intel, do knocks on
6  doors, speak with neighbors, you know. I ask
7  different patrol officers, you know, what they see
8  out there, because, pretty much, they are dealing
9  with the general public day in and day out, more
10 than I will -- would.
11    And I pretty much move forward from there.
12 Q. Is that the system used to identify the
13 person who you made the buy from in Ladayton
14 Williams' home?
15 A. Yes, sir.
16 Q. What procedure did you go through to get
17 the search warrant in this particular matter?
18 A. I pretty much -- I make contact with my
19 confidential informant, and that's when the
20 informant advised me that Ladayton was dealing and
21 distributing crack cocaine on Pecan Street out of
22 his residence. And that's when I made contact with
23 Deputy Bilbro, and he and I conducted an undercover
24 operation.
25    We made contact with the confidential

EXHIBIT A - DEPOSITION OF EDDIE EARL

| | |
|---|---|
| 1  informant. The informant was equipped with video<br>2  and audio surveillance equipment to conduct the<br>3  transaction. And he was also furnished Coahoma<br>4  County Sheriff's Office funds to complete the<br>5  undercover operation.<br>6       And after we gave him the funds to<br>7  conduct -- him -- I mean gave the CI the funds to<br>8  conduct the operation, that's when we got the CI<br>9  close by the buy location. And that's when we let<br>10 the CI out to attempt to make contact with Ladayton.<br>11 The first time the CI went to Ladayton's home, the<br>12 CI was advised that Ladayton was in the shower and<br>13 to come back.<br>14      And that's when the CI came back to us, and<br>15 we rode around a little bit. And then we put the CI<br>16 back out again to make contact with Ladayton, and,<br>17 this time, the CI did make contact with Ladayton.<br>18      And it was -- it was other individuals in<br>19 Ladayton's home. They was sitting around a pool<br>20 table inside of Ladayton's home, and that's when the<br>21 CI purchased crack cocaine from Ladayton. And he<br>22 also -- I mean the CI also purchased marijuana from<br>23 another individual in Ladayton's home.<br>24      And after the CI completed the transaction,<br>25 that's when the CI came back to Bilbro and I, and<br>Page 26 | 1   A. Yes, sir. It's policy that you must have<br>2  two individuals or more with you at the time of<br>3  dealing with any informant.<br>4   Q. Okay. What -- now, did you have to get any<br>5  kind of special permission from above before you<br>6  went out to make this buy?<br>7   A. Yes, sir. I -- I had notified my<br>8  supervisor, Chief Deputy Leon Williams, and I was<br>9  given the green light to complete the buy.<br>10  Q. Okay. Now, you said there were other<br>11 individuals in the home.<br>12      Do you know who those other individuals<br>13 were?<br>14  A. I couldn't tell who the other individuals<br>15 were in the home at the time, and we had --<br>16 actually, when the CI was gone, Bilbro and I went<br>17 back to my office. And we looked at the video<br>18 footage over and over again.<br>19      We could make out Ladayton, but the other<br>20 individuals, we couldn't make out who they were.<br>21  Q. Why -- why -- why couldn't you make them<br>22 out? Because they were too far from the camera<br>23 or --<br>24  A. I mean, you could see them, but we didn't<br>25 know their names. I mean, I didn't know -- I never<br>Page 28 |
| 1  that's when the crack cocaine was relinquished over<br>2  to me. And I put it in an evidence bag, and, later,<br>3  put it in an evidence locker as evidence submission<br>4  to be submitted to the crime lab for examination.<br>5       And, after that crack cocaine was<br>6  relinquished over to me, that's when we searched the<br>7  CI again and made sure the CI didn't have any<br>8  illegal drugs or weapons on him after the<br>9  transaction. And we also searched the CI before the<br>10 transaction to make sure that the CI don't have any<br>11 drugs or illegal weapons on them at the time for<br>12 their safety and our safety as well. And after we<br>13 took custody of the drug evidence, that's when the<br>14 CI was required to do a CI statement, and the CI did<br>15 do the statement.<br>16      And that's when we paid the CI for their<br>17 services rendered to the Coahoma County Sheriff's<br>18 Office, Narcotic Division.<br>19  Q. Uh-huh.<br>20      Now, when you said "we," who is -- who all<br>21 was with you at the time?<br>22  A. At the time of the undercover operation?<br>23  Q. Yes.<br>24  A. Deputy Bilbro.<br>25  Q. So it was just you and Deputy Bilbro?<br>Page 27 | 1  had interaction with them before.<br>2   Q. And you said he bought some marijuana from<br>3  another individual?<br>4   A. Yes, sir.<br>5   Q. Do you know who that individual is?<br>6   A. I didn't know that individual's name.<br>7   Q. And do you now know any of those other<br>8  individuals' names?<br>9   A. I still don't know those individuals'<br>10 names. The only individual I knew by name was<br>11 Ladayton Williams.<br>12  Q. Okay.<br>13  A. And that's because I grew up in the same<br>14 neighborhood with him, so I've known him since I was<br>15 a -- a kid.<br>16  Q. After that, you -- you went and procured a<br>17 warrant?<br>18  A. Yes, sir. I prepared a search warrant for<br>19 that residence. I let my supervisor know that I was<br>20 going to prepare a search warrant for that<br>21 residence, and I took it to the judge and had the<br>22 judge to sign it.<br>23      And that's when I prepared my ops plan, as<br>24 well, to forward to my supervisor and on up to the<br>25 sheriff, to let the upper brass know what was about<br>Page 29 |

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 30**

1 to go on.
2 Q. Okay. When you said to -- to develop your
3 ops plan, what was that plan?
4 A. The ops plan is just, pretty much, the date
5 and time we're going to do the search warrant on the
6 residence, what agencies are going to be involved,
7 what individuals are going to be involved, pretty
8 much -- pretty much, just giving a -- giving the --
9 supervising (sic) the sheriff and the other
10 individuals who was a part of the raid an idea on
11 what we're about to go into, who are the individuals
12 we're going after, and what's their name and are
13 (sic) they appear to be violent, are any animals in
14 the home or any children in the home.
15    Pretty much just a -- me doing my general
16 homework on it and forwarding it up to them.
17 Q. Okay. Now, when the CI was -- now, did the
18 CI actually enter the home or was he just outside
19 the home, looking in?
20 A. No. He actually went inside the home and
21 made it past the front -- the front room and made it
22 into the game room. I would say it was a game room.
23 I mean, he had a pool table, but I don't know what
24 he calls it.
25 Q. Okay. So he actually entered the home and

**Page 31**

1 then -- now, that -- when he bought the -- when he
2 allegedly bought the drugs, did he buy them up front
3 or he was back there in this back room that you were
4 talking about when he made the purchase?
5 A. To my knowledge, I recall them being in the
6 game room.
7 Q. Okay. So if you -- so he basically --
8 through his camera, you could pretty much see the
9 layout of the whole home, correct?
10 A. Yes, sir. To the -- from the front room up
11 to -- to what I would say the game room, I -- I knew
12 the layout of that part.
13 Q. Okay. Now, when he was in the home, did
14 you see any weapons of any kind in there?
15 A. I did not.
16 Q. Did he tell you that he saw any weapons in
17 the home?
18 A. I asked him were there any weapons in the
19 home, and he stated -- the CI stated no.
20 Q. Okay. Now, had you -- you say you had no
21 other interactions prior to this with Mr. Williams,
22 correct?
23 A. No, sir. I -- I mean, I see him all the
24 time, because his mother stay in the same
25 neighborhood as my grandmother.

**Page 32**

1 Q. And have you had any -- have you ever heard
2 of any inter- -- any -- any incidences where
3 Mr. Williams was brandishing a gun, using a gun, had
4 any weapons against anyone?
5 A. No.
6 Q. Okay. The same question regarding the
7 other people in the home. Had you had any
8 information or intel where any of the other people
9 had tried to use a gun to commit violence against
10 anyone?
11 A. No, sir.
12 Q. Okay. Now, in terms of Chief Deputy
13 Williams, he's no longer with Coahoma County,
14 correct?
15 A. No, he resigned, also. He's in New -- he's
16 in some part of New Guinea, doing security work
17 overseas.
18 Q. Okay. So he left Coahoma County and then
19 went to work in -- overseas?
20 A. Yes, sir.
21 Q. Do you know what prompted him to do that?
22 A. I -- I can't say. I mean, pretty much like
23 a -- a little shortly after that, he -- he told me
24 that, you know -- that he was going to resign and go
25 home, going to be with his family, and that he was

**Page 33**

1 looking to go overseas to find work. And he was
2 like, pretty much, things wasn't just working out
3 there.
4 Q. Now, do you know if he voluntarily resigned
5 the position or was he asked to leave or any- -- do
6 you know?
7 A. I can't say. I -- I -- I wouldn't know. I
8 mean, the --
9 Q. Okay.
10 A. -- only thing I -- the only -- I never got
11 in his personal business like that. I mean, it was
12 just pretty much, you know, supervisor and worker.
13 Q. So soon as -- but as soon as this right
14 here -- as soon as this case happened regarding
15 Mr. Mason, he -- how long after that did he put in
16 his resignation?
17 A. I'll say like a couple of weeks up to a
18 month.
19 Q. So -- and did you -- you never spoke with
20 him at all regarding why he was leaving, or he never
21 said anything to you about, "Hey, I'm leaving; hey,
22 nobody asking me to leave," or anything like that?
23 A. No. I -- he used to always talk to me
24 about going back overseas, doing security work,
25 because he was doing that before he came to the

```
 1   sheriff's department. And he just pretty much was
 2   telling me, you know, "One day, I'll" -- you know,
 3   "You'll look up, and I'll be gone, you know. I'm
 4   just passing through here. I'm not here to stay."
 5        Q. Oh, okay.
 6        A. That's pretty much what he used to tell me,
 7   you know -- you know, "Learn what you can learn from
 8   me, because, you know, I'm not going to be here
 9   long. I might decide any day and call the sheriff,
10   you know, and say, 'Hey, you know, I'm done.'"
11        Q. Okay. Did -- did he have any -- did he
12   have a wife and children?
13        A. Yeah, he has a wife and children.
14        Q. And how old -- were his children young or
15   older?
16        A. No. All of his children are grown.
17        Q. Oh. So did they -- they still here or did
18   they leave and go overseas with him?
19        A. One of his sons works for Oxford Police
20   Department, and two of his daughters are -- are
21   nurses. And his wife is the -- she's a -- a
22   secretary for the president of the community
23   college, Coahoma Community College.
24        Q. Oh. So she's -- she's still here?
25        A. Uh-huh.
                                                Page 34

 1        Q. So his home is still here; he just --
 2        A. Yes, sir.
 3        Q. -- him personally is just overseas
 4   somewhere?
 5        A. He contracts over there probably like a
 6   couple of months up to a year.
 7        Q. And when is the last time you had any
 8   communication with Chief Deputy Williams?
 9        A. I talked to him maybe like a month or so
10   back -- back, and he would -- he had just come back
11   into the States.
12        Q. Okay. And is he -- is he here now or is he
13   gone or do you know -- do you know?
14        A. He was going back overseas. He had came
15   back because we had some drug cases going forward
16   and he was subpoenaed. They had subpoenaed him
17   before he even got a chance to leave.
18        Q. Okay. Who -- who subpoenaed him?
19        A. Stephanie Brown, the -- one of the DA --
20   ADAs.
21        Q. And so he -- so he was able -- they were
22   able to give him a subpoena, and he was able to come
23   back?
24        A. Yeah. He came back, but they didn't go
25   forward with the case. They went forward with
                                                Page 35

 1   another case.
 2        Q. Uh-huh.
 3           Do you know the name of the company he
 4   works for?
 5        A. I don't know the name of the company, but
 6   I -- I just know he's in New Guinea.
 7        Q. Uh-huh.
 8        A. That's the only thing he ever said to me.
 9        Q. Uh-huh.
10        A. I don't even know where -- where that's at.
11        Q. Has he ever said anything to you about this
12   particular matter?
13        A. Talking about the -- have we revisited the
14   shooting?
15        Q. Yes. Mr. Mason's case. Yes.
16        A. No, we don't ever talk about it.
17        Q. Okay. Now, I had read in some of the notes
18   that you had a -- that you had a meeting prior to --
19   prior to the actual breach.
20           Is that correct?
21        A. I always have briefings before -- on every
22   raid before I -- that's -- that's to let the -- the
23   team know what's going on and to let them know, you
24   know, what we're about to go into so they won't be
25   blindsided.
                                                Page 36

 1        Q. Okay. Now, the meeting prior to this --
 2   going to the home of Ladayton Williams, who all was
 3   there?
 4        A. Otha Hunter, Demetria Moore, Marcus Cohen,
 5   Eric Bilbro, Leon Williams, Johnny Jones, and
 6   Fern- -- and Chief Fernando Harris.
 7        Q. And those last two people, they work for
 8   the City of Clarksdale?
 9        A. Yes, sir.
10        Q. Okay. And what were the assignments that
11   each person was supposed to have when they got to
12   the home?
13        A. Myself, Eric Bilbro, Marcus Cohen, and Otha
14   Hunter, we was a part of the breach team, and Deputy
15   Moore, Tracy Vance, Johnny Jones, and Chief Harris
16   and Leon, they was all -- they was going outer
17   perimeter.
18        Q. Now, what was -- what was each person's --
19   in the breach team, what was each person's duty?
20        A. Otha was the ram man. Cohen was the
21   shield. I was the pick, and Bilbro would have been
22   the -- Bilbro would have been the first person in.
23        Q. Okay. Now, tell me what each one of those
24   people were supposed to do.
25           I understand you had a term, but --
                                                Page 37
```

10 (Pages 34 - 37)

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

Page 38

A. Oh. Well, Mar- -- I mean Hunter is the breacher. He pretty much rams the door to allow us to gain entry.

Q. Uh-huh.

A. And once he rams -- breaches the door, then he gets out of the way so that we can get in, and he's the last man in. And Cohen is the shield guy. He pretty much leads us in.

And then Bilbro would be after him, which we call the first man in, and then I would be the second. And then Hunter will be following up behind me.

Q. Now, did anyone from City of Clarksdale enter the home?

A. It probably could have been after, but not at the time of the -- of the breach.

Q. Uh-huh.

So was anyone wearing any audio or video surveillance equipment?

A. Now, Clarksdale, all of they -- their whole agency is body cammed.

Q. Okay.

A. But -- now, Johnny Jones may have filled in the stack behind Otha, you know. I -- but I can't -- I can't say.

Page 39

Q. What --

A. Because I didn't see him.

Q. Okay. Now -- so the order the -- now, tell me the particular order that people actually entered the home.

A. Otha was the first one up, and he breached the door and got out the way, then Cohen, then Bilbro, and then -- it stopped right there with me. But I never got a chance to get in the house because I was stopped right in the doorframe.

Q. Okay. Now, what did -- what did Officer Bilbro -- Deputy Bilbro -- I'm sorry -- have in his hands at the time he went in -- in terms of equipment when he went into the home?

A. He had his -- he had his firearm in his hand.

Q. What type of firearm was that?

A. It's a handgun. It would be Glock 9 millimeter.

Q. Okay. And Deputy Cohen, what --

A. Glock.

Q. -- did he have?

Did he have anything else, other than the Glock?

A. I want to say he had the shield -- the

Page 40

shield in his hand.

Q. Okay. And did anyone else have any -- what weapon were you carrying at the time?

A. I had a pick. The pick in my hand.

Q. So you never pulled your weapon?

A. I mean, I had it in my hand. I had it in my hand.

Q. Okay. But -- but what kind of weapon was that?

A. A Glock 9 millimeter. Our agency carries Glock 9 millimeters.

Q. All right. And so I assume that Officer Hunter -- that's the same kind of weapon that he had?

A. Yes, sir.

Q. Okay. Now, who all did you actually see fire a weapon on that particular day?

A. I actually couldn't see any of them. I didn't see Bilbro nor Cohen fire a weapon. Once they entered the residence, I was stopped like right in the doorframe. And when Bilbro and Cohen entered the residence, I heard a single shot.

And I can't say where it came from, but it come from out of the residence. And that's when I heard multiple shots, and I could see Bilbro's

Page 41

attention and Cohen's attention had shifted towards the right side of the residence.

But I couldn't see what they -- what they saw because I had a brick wall, you know, from the outside of the house, obstructing my view. So what they locked eyes on, I -- I couldn't see until I actually, you know, kind of nudged Bilbro, you know, to go, go, because I was stuck in the doorway.

And if someone was firing out the residence, I never could see it coming because I'm still outside, you know, trying to come in.

Q. Okay.

A. And once we finally got in, that's when I told Bilbro, "Go, go, go," and we went straight ahead and made a left. Bilbro and Cohen went straight ahead and made contact with an individual in the bedroom, and I broke left and made contact with an older guy named Ollie -- Olive or -- Ollie Hardmon.

And that's pretty much all I did, and, once I was coming out with Mr. Ollie, that's when I could see a -- a male subject on the ground over there. And that's when I could see Otha, you know, rendering aid to him, and, after I got Mr. Olive (sic) out of the residence and gave him to the outer

11 (Pages 38 - 41)

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

1  perimeter, I come back in. And that's when I saw
2  him rendering aid to Mr. Mason.
3      Q. Now, you say you heard a -- a -- a single
4  shot, but you don't know where it -- you just know
5  it was from inside the home?
6      A. Yeah, I just know it was inside the home,
7  because I was still outside the home.
8      Q. Uh-huh.
9      A. And I just heard a single shot.
10     Q. Uh-huh.
11     A. And then I heard multiple shots.
12     Q. Uh-huh.
13     A. But where I was, if I, you know -- I'm --
14 I'm -- what -- what they locked eyes on on the right
15 side of the home, I couldn't see it because I was
16 still outside. And the only thing I could see was
17 the brick wall on the outside of the house.
18     Q. Okay. Now, how far were you from Officer
19 Cohen and Officer Bilbro?
20     A. Probably from me to the court reporter
21 (indicating).
22     Q. So --
23     A. That's how close I was on Bilbro.
24     Q. -- so we're going to say 3 feet?
25     A. No. Probably within arm's reach.

Page 42

1      Q. So 2 feet?
2      A. Yes, sir.
3      Q. All right. Because, you know, when you say
4  that -- a certain distance -- when you say from you
5  to the court reporter, they --
6      A. Oh.
7      Q. -- the record don't understand --
8      A. Yes --
9      Q. -- that.
10     A. -- sir.
11     Q. So -- so you were about 2 feet from Cohen?
12     A. Yes --
13     Q. How --
14     A. -- sir.
15     Q. -- how far were -- were you from -- from
16 Deputy Bilbro?
17     A. Probably less than a foot from him.
18     Q. So you were right next to both of them,
19 basically?
20     A. Yes, sir. I was like right up on them.
21     Q. Okay. Now -- and you said you heard --
22 there was a single shot.
23         How far did it sound like the single shot
24 was coming -- or was away from you?
25     A. It was close.

Page 43

1      Q. So --
2      A. It sounded like it was close.
3      Q. -- so it sounded like it was close.
4         Okay. Now, when you entered the home, how
5  far was -- was -- how far was it between the door
6  and the male subject that you saw on the floor?
7      A. Probably from where I'm seated to the
8  television back there (indicating).
9      Q. So I'm -- I'm going to say about 10 feet?
10     A. Yes, sir.
11     Q. Okay. Now, after that, you had a chance to
12 search the home, or did --
13     A. At --
14     Q. -- some- --
15     A. -- at --
16     Q. -- -one --
17     A. -- at that time, well, I was trying to get
18 the home secured --
19     Q. Uh-huh.
20     A. -- to make sure, you know, that no one else
21 was inside the residence, was a threat to us
22 anymore.
23     Q. Uh-huh.
24     A. And once the home was secured, then I -- I
25 was advised, you know, after Mr. Mason was shot to

Page 44

1  not search the home, to contact the Mississippi
2  Bureau of Investigations.
3      Q. Uh-huh.
4      A. Then once they made it to the scene, they
5  advised, you know, "Well, let us do our
6  investigation first, and then we'll go back through
7  the home with you, and let you search for the
8  narcotics."
9      Q. Uh-huh.
10        So -- now, you had a chance to secure the
11 home before anyone left, correct?
12     A. Yes, sir.
13     Q. In your opinion, would anyone have an
14 opportunity to hide something outside the home in
15 the time it took you to -- between the time it took
16 you to enter the home and when you secured it?
17     A. No.
18     Q. Okay. So if there was a -- a -- any
19 additional weapons in the vicinity, you would have
20 found it in the home?
21     A. Yes, sir.
22     Q. Okay. Did you -- or did anyone that you
23 know of find any weapons in the home that did not
24 belong to the Coahoma County Sheriff's Department
25 officers?

Page 45

12 (Pages 42 - 45)

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 46**

1  A. No, sir.
2  Q. Okay. Now, do you know how many shots were
3  taken by Officer Cohen?
4  A. I ain't -- I ain't even know he shot.
5  Q. Okay. So you were -- you said you were 2
6  feet away from him, and you don't -- you -- you
7  didn't know if he shot or not?
8  A. I -- like I said, you -- where I was, I was
9  -- when -- it's like a step up into the house.
10 Q. Uh-huh.
11 A. When Bilbro stepped up, you know, I'm
12 still -- I'm still down, so his back is blocking my
13 view. But once he actually stepped in -- he stepped
14 in and turned.
15 Q. Uh-huh.
16 A. And I could see them lock eyes on
17 something, but I don't know what they saw.
18 Q. Uh-huh.
19 A. And, at this point, when I'm hearing the
20 shots, I'm steady nudging him, you know, to -- to go
21 so I can get in the house. Just in case somebody
22 started to return fire, you know, at me, that I can
23 see where it's coming from, but, at this point, I
24 couldn't see nothing.
25 Q. Now, do you know how many shots

**Page 47**

1  Deputy Bilbro took?
2  A. I -- I don't know how many shots that he
3  fired.
4  Q. Okay. So you don't -- all right. Now, did
5  anyone -- did either one of them say anything to you
6  about firing any -- any shots?
7  A. No, sir. Once I nudged him, pretty much,
8  to go, that's when he went on ahead and went.
9  Q. Have you had any discussions with them
10 after this regarding this incident?
11 A. No, sir.
12 Q. Okay. Now, I was told that Officer Cohen
13 and Officer Bilbro, after this, took it upon
14 themselves -- I think they took their own personal
15 time and their own personal money and went and got
16 some additional training on breaching of homes.
17    Were you aware of that?
18 A. No, I was not.
19 Q. So they never asked you about going and
20 never made any mention to you of it?
21 A. No, not about no training.
22 Q. Okay. Now, you developed a plan -- who --
23 you developed a plan on how everyone was supposed to
24 go in the home, correct?
25 A. Pretty much.

**Page 48**

1  Q. Pretty much is?
2  A. I -- I prepared it, and then I forwarded it
3  up to my supervisor. And he'll --
4  Q. Okay.
5  A. -- say, "Yes, you know, I want this person
6  to do this," or "No, I don't" -- "We need to change
7  this."
8  Q. Okay. Now, you -- so did everyone do
9  everything according to how the plan was laid out?
10 A. Every- -- the -- the execution, yeah. Yes,
11 sir, I would say.
12 Q. So is there something that went -- that
13 happened in a -- in a way that you don't think was
14 appropriate?
15 A. Meaning?
16 Q. Meaning however you want that to mean.
17    Did -- did everything go according to how
18 you wanted it to go?
19 A. No.
20 Q. Why not?
21 A. Because an individual was shot.
22 Q. Okay. Now -- and in -- in terms of -- what
23 do you think could have happened differently?
24 A. I would say maybe the timing.
25 Q. Explain that.

**Page 49**

1     And what do you mean in terms of timing?
2  A. More lighting.
3  Q. Okay. By whom?
4  A. Sir?
5  Q. By whom?
6  A. No.
7  Q. Who the --
8  A. No, I'm saying by more lighting, like the
9  time of the -- time of day.
10 Q. Okay. So you think it would have been
11 better if it had been done in the daytime?
12 A. No. I would say probably when the sun is
13 coming up.
14 Q. Uh-huh.
15    Now, is there a -- a procedure for having
16 better lighting when you're going and doing night
17 breaches?
18 A. It just depends -- it depends, the best
19 time to catch the individuals at the home.
20 Q. Uh-huh.
21 A. That's the time that I normally would do my
22 raids. I pretty much kind of do surveillance on the
23 home, seeing when he's leaving or when he's coming
24 or who's coming to the house and different things of
25 that nature.

13 (Pages 46 - 49)

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 50**

1  That's the point of the ops plan, to see
2  what time of day he's -- the most foot traffic or
3  when he doesn't have any foot traffic or when he's
4  confined to the home. And before I do a raid, I
5  always do a drive-by on the house to make sure that
6  the bad guy vehicle is there, or if it's something
7  out of the ordinary that's different than from what
8  I seen at the time of the buy.
9  Q. Do you talk to the people who live around
10 the home?
11 A. Yes, sir.
12 Q. Now, on the -- in this particular
13 situation, did any of those people tell you that
14 they had seen somebody like use weapons in the home
15 or any instances of violence at that home?
16 A. No, sir. The only thing I was advised that
17 Ladayton has a lot of foot traffic, and he was known
18 for distributing narcotics.
19 Q. Uh-huh.
20   Now, who all was inside the home?
21 A. The only one I -- that I came in contact
22 with?
23 Q. Yes.
24 A. I just saw Olive Hardmon, the -- Willie Joe
25 Saffo (sic), and Mr. Mason and Ladayton --

**Page 51**

1  Q. Okay.
2  A. -- and the female subject.
3    What's her name?
4  Q. Is it Sharon -- Sharon Wade?
5  A. Yeah, that's her name.
6  Q. Okay. Do you know where each one of the
7  people were when they were found in the home?
8  A. What I could say that Olive and Willie Joe
9  Saffo was in the front of the residence. Mr. Mason
10 was in the front room. Ladayton and Sharon was in
11 his bedroom.
12 Q. Now, when you said that -- Mr. Staffo (sic)
13 and Mr. --
14 A. Olive.
15 Q. -- Ollie were up front, were they in a room
16 up front, or were they just --
17 A. In bedrooms up front.
18 Q. Okay. They were in bedrooms up front,
19 where the door is closed?
20 A. Yes, sir.
21 Q. So the doors -- when you came in, the doors
22 were closed, and they were inside in the rooms. And
23 the -- and were there rooms to where Mr. Williams
24 and Ms. Wade -- do you know if they were close?
25 A. No. They was at the back of the residence.

**Page 52**

1  Q. Okay. So they were in the back, well away
2  from where you were?
3  A. Yes, sir.
4  Q. So the only person who was in that area
5  when you first come into the home is a person who, I
6  guess, later was identified as Mr. Maurice Mason?
7  A. Yes, sir.
8  Q. And did you have a chance to examine, even
9  with your eyes, his -- his body?
10 A. Who?
11 Q. Mr. Maurice Mason.
12 A. I just saw him bleeding profusely, and
13 that's it.
14 Q. Do you know what caused that?
15 A. I guess as a result of the -- the -- the
16 gunshot that I heard.
17 Q. Okay. Prior to going in the home, what
18 kind of details did you have regarding the layout of
19 the home?
20 A. The only layout I could give was where --
21 where the CI went, and that was it. And I was
22 advised that he had five or six pit bull dogs in the
23 back of the residence.
24 Q. And none of those dogs were -- those dogs
25 were -- they --

**Page 53**

1  A. They was like -- it's -- they was all
2  spaced out all across the backyard, like he had one
3  over here (indicating) and one over there
4  (indicating) and one there (indicating) and one
5  there (indicating), one on the other side of the
6  house.
7  Q. Okay. Were they like in their own
8  individual kennels, or was it just a wide open space
9  or how?
10 A. Some of them had their own kennels,
11 homemade kennels, and the dogs was -- they was
12 attached to a -- the chains was so thick on the
13 dogs, it was like a car chain, where the dogs were
14 restrained with.
15 Q. Oh. So all the dogs were restrained?
16 A. Yes, sir.
17 Q. And how many dogs was it?
18 A. About five.
19 Q. Uh-huh.
20   And, at the time that you breached the
21 home, they had -- the dogs had no way to enter the
22 home?
23 A. No, sir.
24 Q. Now, do you have a procedure for an officer
25 when they're coming in to have like lights or -- on

14 (Pages 50 - 53)

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

**Page 54**

1  their person or a flash- -- or flashlights in their
2  hands when they're coming in to do a breach at
3  night?
4      A. We all have our own individual lights.
5  Some of them have lights on the guns.
6      Q. Now, did anybody have a light on their gun
7  on this particular day?
8      A. I think Bilbro and Cohen did.
9      Q. Did anyone have any -- so I guess, did they
10 have a flashlight or anything like that besides that
11 light on their gun?
12     A. Yes, sir.
13     Q. Were they using them at the time they went
14 into the home?
15     A. I can't say, because, like I said, I was --
16 I was behind them.
17     Q. Okay. And who was in charge of the actual
18 breach?
19     A. Who was in charge of it?
20     Q. Yes.
21     A. Otha was the breach.
22     Q. I'm saying who was the person in charge of
23 everyone who was --
24     A. Oh, Chief Deputy Leon Williams.
25     Q. Okay. So he was the person who was in

**Page 55**

1  charge of it. And --
2      A. Yes, sir, he was the immediate supervisor
3  for everybody.
4      Q. Had you ever been to the home on Pecan
5  Street prior to the shooting of Mr. Mason?
6      A. Never.
7      Q. Did you ever have any chance to review --
8  besides your CI video, did you review any other
9  video or audio from that particular incident?
10     A. No, sir.
11     Q. Now, when you got to the door, what -- what
12 exactly did you do when you first got to the door?
13     A. I wasn't the first person on the floor,
14 so --
15     Q. Did anyone knock on the door?
16     A. Yeah, we knocked and announced.
17     Q. Well, who knocked on the door?
18     A. I have to say either Cohen or -- or -- had
19 to have been Cohen because he was the first person
20 up, and the -- Hunter had the ram in his hand. So
21 both of his hands was on the ram.
22     Q. So -- so Cohen -- you believe Cohen was the
23 person who knocked on the door?
24     A. Yes, sir.
25     Q. Who announced?

**Page 56**

1      A. Once he knocked, I announced, you know, and
2  everybody started saying, "Sheriff's department,
3  search warrant. Sheriff's department, search
4  warrant." Then --
5      Q. And --
6      A. -- that's when the blue lights and siren
7  was activated.
8      Q. Okay. So -- so when you get to the door,
9  Cohen starts to knock, and, at that same -- and at
10 -- about the same time or at the -- stop me if I'm
11 wrong -- at the same time, people say -- everyone
12 yells out --
13     A. Pretty much it was like (indicating),
14 "Sheriff's department, search warrant. Sheriff's
15 department, search warrant." Then the blue lights
16 and siren kicked on.
17     Q. And then you hit --
18     A. Then --
19     Q. -- the --
20     A. -- the -- then the door was breached.
21     Q. Okay. How long was it between the time
22 that you knocked and the time of the breach of the
23 door?
24     A. I didn't knock.
25     Q. Well, the time Cohen knocked and breached

**Page 57**

1  the door?
2      A. Probably less than some seconds.
3      Q. Okay. So you don't know if Mr. Mason made
4  any kind of movement or what Mr. Mason did before --
5  prior to being -- prior to being shot, correct?
6      A. No, sir.
7      Q. Because yous (sic) -- as you said, you were
8  behind Officer Cohen -- I mean Deputy Cohen?
9      A. Bilbro.
10     Q. Bilbro.
11        All right. You were behind Deputy Bilbro?
12     A. Yeah, it was Cohen, then Bilbro, then me.
13     Q. Okay. And by the time -- the first time --
14 the first time you saw Mr. Mason, he was already on
15 the floor?
16     A. Yes, sir.
17     Q. And beating -- bleeding profusely, as you
18 said earlier?
19     A. Yes, sir.
20     Q. So no one would have an opportunity before
21 -- between the time that you knock and the time that
22 the ram hits the door to actually come and open the
23 door?
24     A. No, sir.
25     Q. And this is the same procedure you use for

15 (Pages 54 - 57)

```
 1  all your raids?
 2      A. Yes, sir.
 3         Well, the only person I could say that
 4  probably had the opportunity to come to the door was
 5  Mr. Mason because he was inside of that front room
 6  on the couch. So he had an opportunity to open the
 7  door.
 8      Q. But you -- but you earlier said that there
 9  was a couple of seconds between the time that you
10  knocked and the time the ram hit the door?
11      A. Yeah, like within a couple of seconds.
12      Q. So would that legitimately give him enough
13  time to get up and come to the door?
14      A. From where he was seated, I would say yeah.
15      Q. Okay. So after Officer Bilbro and -- and
16  Cohen -- and Cohen came -- entered the home, they
17  stopped?
18      A. Yeah, they kind of came to a stop, and they
19  (sic) attention was focused on some sort of target
20  on the right side of the home.
21      Q. Did any of the other -- other deputies or
22  officers say anything to you after they entered the
23  home?
24      A. No.
25      Q. Who was in possession of the actual warrant
                                              Page 58
```

```
 1  on that -- for that particular raid?
 2      A. I had -- I had a copy of it.
 3      Q. Okay. And what did -- what was the warrant
 4  for exactly?
 5      A. To search for illegal narcotics.
 6      Q. At --
 7      A. At Ladayton's residence.
 8      Q. Do you think the other deputies could have
 9  done something differently to prevent Mr. Mason from
10  being shot?
11      A. I can't say what they -- they could have
12  did differently. I can only say what I could have
13  did.
14      Q. What could you have done?
15      A. I did what I was supposed to have been
16  done.
17      Q. So you couldn't have done anything
18  differently, and you don't know if they could have
19  done anything differently?
20      A. I can't say what they would have done.
21  I -- what I -- what I did, you know, I -- I -- I did
22  what I was -- what I was -- the tasks that I had
23  laid out to do.
24      Q. Did they ever offer any additional training
25  through Coahoma County Sheriff's Department
                                              Page 59
```

```
 1  following this or any other -- other breaches?
 2      A. No, sir.
 3      Q. And who trained you for Coahoma County on
 4  how to do breaches?
 5      A. I was trained prior to getting there. I
 6  was a part of Clarksdale Police Department SWAT
 7  team. I was a SWAT member.
 8      Q. Okay. And who trained you when you was
 9  over at Clarksdale?
10      A. Captain Ricky Bridges, Commander Nicholas
11  Walsh, and Commander Vincent Ramirez.
12      Q. And what kind of training did that -- did
13  they give you?
14      A. Pretty much how to breach a residence, how
15  to enter a residence, what's a safe way to hold
16  your -- your firearm if you're in a -- in a stack,
17  and different things like that. We also did
18  low-light breaching, and we did lit breaching.
19      Q. Okay. And what was the -- what was the
20  procedure for low-light breaches?
21      A. Low-light breaches, we had -- we had --
22  actually had lights on our shield, and we had blue
23  lights on the bottom. And then we had two huge
24  lights on the front of it that pretty much can light
25  up an entire room.
                                              Page 60
```

```
 1      Q. Kind of like --
 2      A. And --
 3      Q. -- LE- --
 4      A. -- it --
 5      Q. -- -D --
 6      A. -- had --
 7      Q. -- lights?
 8      A. Yes, sir. And it had "police department"
 9  on the front of the shield.
10      Q. Now, did they have those kind of shields
11  over at Coahoma County?
12      A. Yeah, they have a shield with the -- the
13  two lights on the side and "sheriff department"
14  written on the -- on the shield.
15      Q. Well, did the off- -- did the deputies have
16  those particular kind of shields on the night of
17  this breach?
18      A. Yes, sir.
19      Q. Were there lights on them?
20      A. I -- I can't say. Like I said, if you --
21  it's a light -- when -- well, from one -- me looking
22  at it, it's a button, and if he's holding it, when
23  he comes in, he can squeeze that button to where he
24  don't have to reach around and grab his flashlight
25  off his shoulder.
                                              Page 61
```

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

```
 1    Q. So they come equipped with the lighting,
 2  but you don't know if it was on or not?
 3    A. No, sir, I don't know if it was on.
 4    Q. Did you see any lights in front of you?
 5    A. I could see some lights inside of the
 6  residence once they stepped in.
 7    Q. But did you see --
 8    A. But --
 9    Q. -- any light coming from -- emanating from
10  that shield from where Officer Cohen was in front of
11  you?
12    A. No. Because Cohen, you know -- Cohen is a
13  big guy. He's probably about -- every bit of about
14  6'7" and probably weighing almost over 280-something
15  pounds. So he's a big guy, and Bilbro is like 6'6".
16  So if I'm standing down and they take a step up to
17  step up in the house, I can't see anything.
18    Q. Okay. Besides this particular shooting,
19  were you involved in any other shooting with -- when
20  you were with the Coahoma County Sheriff's
21  Department that I -- we hadn't discussed either now
22  or in our prior depositions?
23    A. Talking about where I -- where I shot
24  someone -- I mean, where I --
25    Q. That --
                                              Page 62
```

```
 1    A. -- was --
 2    Q. -- you were involved in, not that you
 3  actually shot anyone.
 4    A. I'll say probably about three before this
 5  one -- no, just three.
 6    Q. And -- and did we discuss all of those in
 7  your prior deposition as well?
 8    A. Yes, sir.
 9    Q. Okay. Now, who called for --
10       Scratch that.
11       Did -- where did -- where did Mr. Mason go
12  after this -- after the scene was cleared?
13    A. To seek medical attention.
14    Q. How did he go there?
15    A. By ambulance.
16    Q. Do you know what ambulance system took --
17  took him?
18    A. Pafford. Pafford.
19    Q. And do you know where he went?
20    A. I don't know where he went. I guess he
21  went probably to our local hospital.
22    Q. Now, do you know if anyone who was involved
23  in the raid that night has been charged?
24    A. I don't know anything about that.
25    Q. Do you know if Mr. Mason was ever charged?
                                              Page 63
```

```
 1    A. No, sir.
 2    Q. Okay.
 3    A. The only person that was charged in
 4  reference to the raid was -- was Ladayton --
 5    Q. Uh-huh.
 6    A. -- Ladayton Williams, and that was for
 7  possession of crack cocaine with intent to
 8  distribute.
 9    Q. Okay. Is that case still pending?
10    A. It's been turned over to the district
11  attorney's office for indictment.
12    Q. Uh-huh.
13       Now, do you feel that there's any
14  additional training that they could have done with
15  Coahoma County that would have prevented this
16  shooting?
17    A. I could say they could have gave us more
18  narcotic and SWAT training, but every time we used
19  to ask for it, they always -- we was -- Cohen had
20  signed us up for a couple of classes, and all the
21  classes that he ever turned in for us to go to, they
22  denied them.
23    Q. So y'all asked -- the -- the -- you asked
24  for additional training, but Coahoma County just
25  wouldn't send you to it?
                                              Page 64
```

```
 1    A. No, they wouldn't send us.
 2    Q. Now, who is this -- who did you turn the
 3  request in to?
 4    A. It went to Chief Deputy Leon Williams, and
 5  then he forwarded it to the sheriff. And the
 6  sheriff makes the decision of whether you go or not
 7  go and approve or disapprove. And --
 8    Q. Do you know -- did he give a reason for why
 9  it was disapproved?
10    A. It just say he disapproved on the paper.
11    Q. Do you know when y'all -- when you made
12  those requests?
13    A. Cohen got copies of all of them.
14    Q. Okay. So he -- so he has copies of all the
15  requests that he's made?
16    A. Uh-huh.
17    Q. Do you know if any of those requests were
18  made prior to this incident?
19    A. They was -- yeah, a lot of them were made
20  before that incident.
21    Q. Okay. What, the year prior, or do you know
22  that time frame?
23    A. I think from a couple of months on up to
24  maybe a year.
25    Q. Okay. How long was it between the time
                                              Page 65
```

EXHIBIT A - DEPOSITION OF EDDIE EARL

### Page 66

1  that Mr. Mason was shot until the ambulance arrived
2  on the scene?
3     A. It wasn't that long. I -- I can't
4  really -- I'll say probably less than 20 -- about 20
5  minutes.
6     Q. Okay. Did -- did you hear -- ever hear
7  Mr. Mason say anything?
8     A. No, sir.
9     Q. Did you hear any of the other people in the
10 home say anything?
11    A. No.
12    Q. Did you hear Mr. Ollie say anything?
13    A. No, sir.
14    Q. And you say you never saw anyone from the
15 City of Clarksdale fire any shots, correct?
16    A. No, sir.
17    Q. And they were all behind you?
18    A. Yes, sir.
19    Q. So if they would have fired some shots, you
20 would have heard it then?
21    A. Yes, sir.
22    Q. And you would have known that they
23 originated from someone with the City of Clarksdale,
24 correct?
25    A. Yes, sir.

### Page 67

1     Q. And you didn't have the opportunity to
2  search Mr. Mason yourself, correct?
3     A. No, sir.
4     Q. Who did you -- did you search anyone, any
5  individual?
6     A. No, sir.
7     Q. Okay. All right. You gave a -- you gave a
8  statement to the MBI, correct?
9     A. Yes, sir.
10    Q. And is there anything that's changed from
11 -- that you may have remembered differently or
12 changed from the statement that you made with the --
13 with the MBI?
14    A. No, sir.
15    Q. Did you have -- interview any other people
16 who were inside the home at any time following the
17 shooting?
18    A. I just interviewed Ladayton.
19    Q. And what was the -- when was that?
20    A. I done forgot the date. It was the same
21 day of, though.
22    Q. Okay. And did you question him regarding
23 the --
24    A. The nar- --
25    Q. -- shoot- --

### Page 68

1     A. -- -cotics --
2     Q. -- -ing -- the shooting itself, or was it
3  just strictly for narcotics?
4     A. Narcotics.
5     Q. Okay. Now, do you know if any officer was
6  required to go for any psychological exams following
7  this shooting?
8     A. I would think they would.
9     Q. Uh-huh.
10 But you didn't go yourself?
11    A. No. I -- we went to a -- a debriefing.
12    Q. Uh-huh.
13 At the time of the raid, what was your
14 rank?
15    A. Corporal.
16    Q. And when you left the Coahoma County, what
17 was your rank?
18    A. Sergeant.
19    Q. So you had got a raise between the time of
20 the -- the shooting and up -- prior to you leaving?
21    A. Yes, sir.
22    Q. Okay. Were you over Deputy Bilbro and
23 Deputy Cohen at the raid?
24    A. No, Cohen was our -- me and Bilbro obtained
25 the same rank, and Cohen was a master sergeant.

### Page 69

1     Q. Okay. Have you been involved in any
2  shootings while you were off duty?
3     A. No, sir.
4     Q. Uh-huh.
5  Do you believe you had a fair opportunity
6  to answer all of my questions today?
7     A. Yes, sir.
8     Q. Is there anything else you would like to
9  add to your testimony?
10    A. No, sir.
11 MR. WILLIAMS: Tender the witness.
12 MR. LUCIANO: I don't have any
13 questions.
14 MR. CARR: No questions.
15 THE VIDEOGRAPHER: The time is
16 12:18 p.m. We're off the record.
17 (Exhibit 1 marked for identification and
18 attached hereto.)
19 (Deposition concluded at 12:18 p.m.)

18 (Pages 66 - 69)

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL

```
 1         CERTIFICATE OF DEPONENT
 2      I, Eddie Earl, deponent in this deposition,
 3   hereby certify that I have examined the foregoing 69 pages
 4   and find them to contain a full, true, and accurate
 5   transcription of the testimony as given by me on
 6   October 5, 2021, in Cleveland, Mississippi.
 7   Page   Line      Correction (If Any)
 8   ___   ___   _____
 9   ___   ___   _____
10   ___   ___   _____
11   ___   ___   _____
12   ___   ___   _____
13   ___   ___   _____
14        This the _____ day of _____, 2021.
15
16              _____
17                      EDDIE EARL
18   State of Mississippi
19   County of _____
20   Sworn to and subscribed before me, this the _____ day of
21   _____, 2021.
22              _____
23                    NOTARY PUBLIC
24   MY COMMISSION EXPIRES _____
25
                                                    Page 70
```

```
 1         CERTIFICATE OF COURT REPORTER
 2      I, Courtney R. Taylor, Court Reporter and Notary
 3   Public in and for the County of Bolivar, State of
 4   Mississippi, do hereby certify that the foregoing 69
 5   pages, and including this page, contain a true and
 6   accurate transcription of the testimony of Eddie Earl, as
 7   taken by me in the aforementioned matter at the time and
 8   place heretofore stated by stenotype and later reduced to
 9   typewritten form under my supervision by means of
10   computer-aided transcription.
11      I further certify that under the authority
12   vested in me by the State of Mississippi that the witness
13   was placed under oath by me to truthfully answer all
14   questions in this matter.
15      I further certify that I am not in the employ of
16   or related to any counsel or party in this matter and have
17   no interest, monetary or otherwise, in the final outcome
18   of this proceeding.
19      Witness              the 18th day
20   of October, 2021
21
22         COURTNEY R. TAYLOR, CCR #1668
23
24
25   My Commission Expires: August 19, 2023
                                                    Page 71
```

```
 1   aluciano@jlpalaw.com
 2              October 19, 2021
 3   RE: Mason, Maurice v. City Of Clarksdale, Et Al
 4   DEPOSITION OF: Eddie Earl (# 4833510)
 5       The above-referenced witness transcript is
 6   available for read and sign.
 7       Within the applicable timeframe, the witness
 8   should read the testimony to verify its accuracy. If
 9   there are any changes, the witness should note those
10   on the attached Errata Sheet.
11       The witness should sign and notarize the
12   attached Errata pages and return to Veritext at
13   errata-tx@veritext.com.
14       According to applicable rules or agreements, if
15   the witness fails to do so within the time allotted,
16   a certified copy of the transcript may be used as if
17   signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
                                                    Page 72
```

19 (Pages 70 - 72)

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

EXHIBIT A - DEPOSITION OF EDDIE EARL