```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF MISSISSIPPI
                  GREENVILLE DIVISION


MAURICE MASON, SHARON WADE,
LADAYTON WILLIAMS, OLLIE HARDMON,
AND WILLIE JOE SAFFORD                        PLAINTIFFS


V.                       CIVIL ACTION NO. 4:20-CV-164-DMB-JMV


CITY OF CLARKSDALE; COAHOMA COUNTY,
MISSISSIPPI; COAHOMA COUNTY SHERIFF'S
OFFICE, MASTER SERGEANT MARCUS COHEN,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY, DEPUTY ERIC BILBRO,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY, AND JOHN AND JANE DOES 1-10         DEFENDANTS



              VIDEO DEPOSITION OF EDDIE EARL

   Taken at the instance of the Plaintiffs on Tuesday,
October 5, 2021, in the offices of Jacks|Griffith|Luciano,
   P.A., 150 North Sharpe Avenue, Cleveland, Mississippi,
                   beginning at 11:05 a.m.




                 (Appearances noted herein)






REPORTED BY:  Courtney R. Taylor, CCR, TLC
              Alpha Reporting A Veritext Company
              236 Adams Avenue
              Memphis, Tennessee 38103
```

Page 1

1       Q.   And so how would you -- you would define --
2  how would you define your leaving the sheriff's
3  department?
4            Would it -- would you describe it as
5  amicable?
6            Would you describe it as amicable?  Was it
7  something where they said, "You're" -- "you're" --
8  "You are rehired, you can come back anytime," or --
9       A.   Yeah, I can -- I can come back if I wanted
10 to.
11      Q.   And they -- and they told you that you're
12 free to come back?
13      A.   Pretty much.
14      Q.   So --
15      A.   Pretty much from my supervisor.  I mean, I
16 don't know about the sheriff.  I don't deal directly
17 with him, but, from my supervisor, he -- the chief
18 deputy, said, you know, that if I wanted to come
19 back, I could.
20      Q.   And what's that -- what's that chief
21 deputy's name?
22      A.   Fernando Bee.
23      Q.   And you say you -- you never spoke with the
24 sheriff regarding that, correct?
25      A.   No, sir.

Page 20

```
 1        Q.   All right.  How did -- what did you do to
 2   prepare for this deposition today?
 3        A.   Nothing.  The only thing I can tell you is
 4   from what happened when I -- when I was working
 5   there during the time of the events.
 6        Q.   Okay.  So no one gave you any documents or
 7   anything like that to review or anything?
 8        A.   No, sir.
 9        Q.   Okay.  And -- now, prior to the date of the
10   shooting, did you have any interaction with Maurice
11   Mason?
12        A.   No, sir.
13        Q.   Had you had any contact with Sharon Wade?
14        A.   No, sir.
15        Q.   Had you had any contact with Willie Joe
16   Safford?
17        A.   No, sir.
18        Q.   Had you had any contact with Ollie Hardmon?
19        A.   No, sir.
20        Q.   Had you had any contact with Ladayton
21   Williams?
22        A.   No, sir.
23        Q.   Now, according to the report, you had a
24   confidential informant make a buy at that -- at
25   907 -- at -- at 907 Pecan Street?
```

Alpha Reporting        800-556-8974
A Veritext Company        www.veritext.com

1  A. I think that's the address. It's in the
2  900 block. I don't know exactly what -- what's --
3  the address is. It's been sometime now.
4  Q. Okay. We'll just -- we'll just say at --
5  at the home of Ladayton Williams.
6  Okay?
7  A. Yes, sir.
8  Q. That'd be fine?
9  So you had someone make a buy at the home
10 of Ladayton Williams?
11 A. Yes, sir.
12 Q. And what date -- do you remember what date
13 that was?
14 A. No, sir, I can't recall the date.
15 Q. Do you remember how -- how far was it
16 between the date of the buy and the date that --
17 that -- that you -- that you went and raided the
18 home?
19 A. I would say probably -- I would say
20 probably in the next day or maybe a couple of days
21 after.
22 Q. Okay. Do you typically have someone watch
23 the home during that time period, between when you
24 -- when you -- when the C- -- when the CI makes the
25 buy and when you actually go in and make -- and do

Page 22

1  the raid?
2      A.  No, sir.  I -- I only watch the CI at the
3  time when he's doing the undercover operation, and
4  that's for his safety, you know, just if something
5  were to break bad, that I can be there to protect
6  him or her.
7      Q.  Okay.  Now, that CI, do -- do they -- are
8  they required to wear any audio or visual recording
9  devices?
10     A.  Yes, sir.
11     Q.  Was there -- was there one on this
12 particular date wearing any?
13     A.  Yes, sir.
14     Q.  Okay.  Do you know who's in possession of
15 those recordings?
16     A.  I turned the case in to the district
17 attorney's office, and they should -- they -- they
18 have a copy of everything.
19     Q.  Okay.  Now, this CI, how many -- how long
20 had you been dealing with this individual?
21     A.  I would say probably over two years.
22     Q.  And so this person had made multiple buys
23 for you?
24     A.  Yes, sir.
25     Q.  And had they testified -- they ever

Page 23

1  testified in court for you before?
2       A.  Yeah, they have.
3       Q.  Have this person ever been found to be
4  making untrue statements in a trial or to you?
5       A.  No, sir.
6       Q.  And what is your procedure for making
7  someone a -- a CI?
8       A.  Pretty much, our number one thing is to
9  prove them credible, and to prove -- how to prove
10 them credible is through wearing audio and video
11 surveillance footage and proving them credible and
12 building their credibility that way.
13      Q.  Now, the -- the bills that the person used
14 to make the buy, are they marked?
15      A.  Yes, sir, and photographed.
16      Q.  Okay.  And you -- do you mark and -- do you
17 do the same, mark and photograph whatever he buys
18 when -- on that particular day?
19      A.  Yeah.  Any time I give my informants
20 Coahoma County Sheriff's Office funds, I -- I always
21 take photographs of the funds and write the funds
22 down for the -- for the investigator report to be
23 articulated in court.  And that's for every one of
24 my CIs, I do that for.
25      Q.  Uh-huh.

Page 24

```
 1              Now, what are your methods for identifying
 2      whoever the seller of -- -- of whoever you're going
 3      to make the buy from?
 4           A.   Pretty much what I do is I get out and I
 5      get in the streets.  I gather intel, do knocks on
 6      doors, speak with neighbors, you know.  I ask
 7      different patrol officers, you know, what they see
 8      out there, because, pretty much, they are dealing
 9      with the general public day in and day out, more
10      than I will -- would.
11              And I pretty much move forward from there.
12           Q.   Is that the system used to identify the
13      person who you made the buy from in Ladayton
14      Williams' home?
15           A.   Yes, sir.
16           Q.   What procedure did you go through to get
17      the search warrant in this particular matter?
18           A.   I pretty much -- I make contact with my
19      confidential informant, and that's when the
20      informant advised me that Ladayton was dealing and
21      distributing crack cocaine on Pecan Street out of
22      his residence.  And that's when I made contact with
23      Deputy Bilbro, and he and I conducted an undercover
24      operation.
25              We made contact with the confidential
```

Page 25

1  informant.  The informant was equipped with video
2  and audio surveillance equipment to conduct the
3  transaction.  And he was also furnished Coahoma
4  County Sheriff's Office funds to complete the
5  undercover operation.
6         And after we gave him the funds to
7  conduct -- him -- I mean gave the CI the funds to
8  conduct the operation, that's when we got the CI
9  close by the buy location.  And that's when we let
10 the CI out to attempt to make contact with Ladayton.
11 The first time the CI went to Ladayton's home, the
12 CI was advised that Ladayton was in the shower and
13 to come back.
14        And that's when the CI came back to us, and
15 we rode around a little bit.  And then we put the CI
16 back out again to make contact with Ladayton, and,
17 this time, the CI did make contact with Ladayton.
18        And it was -- it was other individuals in
19 Ladayton's home.  They was sitting around a pool
20 table inside of Ladayton's home, and that's when the
21 CI purchased crack cocaine from Ladayton.  And he
22 also -- I mean the CI also purchased marijuana from
23 another individual in Ladayton's home.
24        And after the CI completed the transaction,
25 that's when the CI came back to Bilbro and I, and

1          That's the point of the ops plan, to see
2     what time of day he's -- the most foot traffic or
3     when he doesn't have any foot traffic or when he's
4     confined to the home.  And before I do a raid, I
5     always do a drive-by on the house to make sure that
6     the bad guy vehicle is there, or if it's something
7     out of the ordinary that's different than from what
8     I seen at the time of the buy.
9          Q.  Do you talk to the people who live around
10    the home?
11         A.  Yes, sir.
12         Q.  Now, on the -- in this particular
13    situation, did any of those people tell you that
14    they had seen somebody like use weapons in the home
15    or any instances of violence at that home?
16         A.  No, sir.  The only thing I was advised that
17    Ladayton has a lot of foot traffic, and he was known
18    for distributing narcotics.
19         Q.  Uh-huh.
20             Now, who all was inside the home?
21         A.  The only one I -- that I came in contact
22    with?
23         Q.  Yes.
24         A.  I just saw Olive Hardmon, the -- Willie Joe
25    Saffo (sic), and Mr. Mason and Ladayton --

Page 50

```
 1        Q.  Okay.
 2        A.  -- and the female subject.
 3            What's her name?
 4        Q.  Is it Sharon -- Sharon Wade?
 5        A.  Yeah, that's her name.
 6        Q.  Okay.  Do you know where each one of the
 7   people were when they were found in the home?
 8        A.  What I could say that Olive and Willie Joe
 9   Saffo was in the front of the residence.  Mr. Mason
10   was in the front room.  Ladayton and Sharon was in
11   his bedroom.
12        Q.  Now, when you said that -- Mr. Staffo (sic)
13   and Mr. --
14        A.  Olive.
15        Q.  -- Ollie were up front, were they in a room
16   up front, or were they just --
17        A.  In bedrooms up front.
18        Q.  Okay.  They were in bedrooms up front,
19   where the door is closed?
20        A.  Yes, sir.
21        Q.  So the doors -- when you came in, the doors
22   were closed, and they were inside in the rooms.  And
23   the -- and were there rooms to where Mr. Williams
24   and Ms. Wade -- do you know if they were close?
25        A.  No.  They was at the back of the residence.
```

Page 51

```
 1         A.   -- was --
 2         Q.   -- you were involved in, not that you
 3   actually shot anyone.
 4         A.   I'll say probably about three before this
 5   one -- no, just three.
 6         Q.   And -- and did we discuss all of those in
 7   your prior deposition as well?
 8         A.   Yes, sir.
 9         Q.   Okay.  Now, who called for --
10              Scratch that.
11              Did -- where did -- where did Mr. Mason go
12   after this -- after the scene was cleared?
13         A.   To seek medical attention.
14         Q.   How did he go there?
15         A.   By ambulance.
16         Q.   Do you know what ambulance system took --
17   took him?
18         A.   Pafford.  Pafford.
19         Q.   And do you know where he went?
20         A.   I don't know where he went.  I guess he
21   went probably to our local hospital.
22         Q.   Now, do you know if anyone who was involved
23   in the raid that night has been charged?
24         A.   I don't know anything about that.
25         Q.   Do you know if Mr. Mason was ever charged?
```

Page 63

1     A.    No, sir.

2     Q.    Okay.

3     A.    The only person that was charged in
4  reference to the raid was -- was Ladayton --

5     Q.    Uh-huh.

6     A.    -- Ladayton Williams, and that was for
7  possession of crack cocaine with intent to
8  distribute.

9     Q.    Okay.  Is that case still pending?

10    A.    It's been turned over to the district
11 attorney's office for indictment.

12    Q.    Uh-huh.

13          Now, do you feel that there's any
14 additional training that they could have done with
15 Coahoma County that would have prevented this
16 shooting?

17    A.    I could say they could have gave us more
18 narcotic and SWAT training, but every time we used
19 to ask for it, they always -- we was -- Cohen had
20 signed us up for a couple of classes, and all the
21 classes that he ever turned in for us to go to, they
22 denied them.

23    Q.    So y'all asked -- the -- the -- you asked
24 for additional training, but Coahoma County just
25 wouldn't send you to it?

Page 64